# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

PAULA SUE GILBERT BROWNYARD, )
)
    Plaintiff/Appellee              )     Chester County No. 6961
)
**v.**                                )
)    Appeal No. 02A01-9803-CH-00063
**ROBERT MICHAEL BROWNYARD,**  )
)
    Defendant/Appellant.      )

## APPEAL FROM THE CHANCERY COURT OF CHESTER COUNTY
## AT HENDERSON, TENNESSEE

### THE HONORABLE JOE C. MORRIS, CHANCELLOR

For the Plaintiff/Appellee:          For the Defendant/Appellant:

Charles A. Spitzer              Lloyd R. Tatum
Jackson, Tennessee            Henderson, Tennessee

**AFFIRMED IN PART, REVERSED IN
PART, MODIFIED AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

# OPINION

This is a post-divorce action based on a petition for contempt and an accounting for delinquent alimony and child support. The trial court found the father in contempt, and granted the mother past due alimony and child support, attorney fees, and amounts owed for college expenses for the parties' child. The father appealed to this Court. We affirm in part, reverse in part, modify, and remand.

Paula Sue Gilbert Brownyard ("Mother") and Robert Michael Brownyard ("Father") were divorced on February 4, 1988. They entered into a Property Settlement Agreement ("the Agreement") approved by the trial court and incorporated into the final divorce decree, giving custody of the parties' two minor children to Mother. Father was not represented by an attorney when the Agreement was drafted and signed. The parties utilized a certified public accountant, Houston Payne ("Payne"), to develop a formula and determine the amount of alimony Father was to pay Mother. Under the Agreement, Father agreed to pay Mother $1500 per month in child support, which increased to $2000 per month starting July, 1988. The parties were to split extraordinary child care costs along with all college expenses.

At the time the parties entered into the Agreement, they owned a 16 2/3% interest in a business called Medical Care Products, Inc. ("the Business"). Father retained all stock in the Business, but was to pay Mother alimony representing her share of "profits, income or appreciation" of the Business. For 1988, the alimony was to be one-half of any distribution over $2000 that Father received in any single month. For 1989 and thereafter, the alimony was to be calculated by totaling the distributions for the year and then subtracting Husband's federal income tax due on the distributions. Next, one-half of the remaining amount was to be divided by 100% minus Mother's marginal tax rate for that year. The relevant provisions of the Agreement regarding the Business read:

> During the period of the marriage the parties have acquired in the name of the Husband an interest in a closely held corporation known as Medical Care Products, Inc. It is the desire of both the Husband and Wife that the Wife shall fairly and reasonably share in the profits, income or appreciation of Medical Care Products, Inc., or any other like or similar corporation acquired by the Husband in place of or as a substitute for Medical Care Products, Inc. It is expressly understood by the parties that the Husband is actively involved in the business of Medical Care Products, Inc. and may have some control over the business activities of Medical Care Products, Inc. It is recognized by the parties that all contingencies concerning the Husband's interest in Medical Care Products, Inc. cannot be foreseen by the parties and that the Husband has an obligation of good faith in protecting the Wife's right to receive future income based on the success or lack of success of Medical Care Products, Inc.

It is, therefore, agreed that the Husband shall have as his sole and exclusive property all the stock or other interest in said Medical Care Products, Inc. The Husband shall, however, pay to the Wife as alimony the following sums:

A. In the year of 1988, the Husband shall pay to the Wife as alimony one-half of any amount of any distribution from Medical Care Products, Inc. that exceeds Two Thousand Dollars ($2,000.00) in any given calendar month.

B. In 1989 and each subsequent year, the Wife shall receive as alimony such sums from the Husband which are to be computed as follows:

1. All distributions to the Husband during each subsequent year will be totaled.

2. From this will be deducted an amount equal to the Federal Income Tax due by Husband on said amounts as appearing on his Schedule K-1 or other appropriate schedule.

3. One-half of the remaining amount calculated in step 2 shall be divided by 100% minus the Wife's marginal tax rate for the current year (e.g. if previous steps yield $5,050.00 and the Wife's current marginal tax rate is 28% then $5,050.00 shall be divided by 72% for a total payment to the wife of $7,014.00).

C. The Husband shall provide each year to the Wife a copy of his Schedule K-1, Form 1025 for Medical Care Products, Inc. each year. These documents must disclose the Husband's taxable income plus distributions made to the Husband for each year by Medical Care Products, Inc.

***

E. If, in the event that Medical Care Products, Inc. is sold, liquidated or in some other way dissolved, then in that event the Wife shall receive as alimony a share of any distribution received by the Husband as calculated in steps 2 and 3 above.

F. If the Husband exchanges or trades his interest in Medical Care Products, Inc., or in some way disposes of his interest in Medical Care Products, Inc., then in that event the Wife shall have the right to receive income on the basis of the formula above stated on any successor corporation, business entity or other similar business interest obtained by the Husband.

For the 1987 tax year, the parties jointly owed the IRS approximately $20,000 in taxes. The IRS debt was not addressed in the Agreement, as the Agreement was entered into before the joint tax return was signed in April, 1988. Father took out a loan for the amount of the debt after the parties' divorce.

In 1992, Father utilized his own funds to purchase an additional interest in the Business. After acquiring this additional interest, his total share of the Business increased from 16 2/3% to 28%. During the years 1992, 1993, and 1994, Father was paid director's and consultation fees by the Business totaling $107,769.42. In 1996, Father sold his entire share in the Business for $100,000.

According to the Agreement, the parties were to split the college expenses for their children. From 1995 to 1997, however, Mother took out a student loan for their son's college expenses with a payoff amount including interest of $17,000. The loan was necessary after their son's scholarship ended.

In May, 1996, Mother filed a petition for contempt and for an accounting. In this petition, she alleged that, since 1993, Father has not provided her with his K-1 tax forms as required by the Agreement. She asserted an alimony arrearage of at least $26,084 and a child support arrearage of $25,000. The child support arrearage was due to Father's failure to increase the monthly child support payment from $1500 to $2000 beginning in July, 1988 as required by the Agreement and his failure to pay one-half of the children's college expenses. The petition asserted that Father paid her no alimony in 1991 and 1992, $2000 in 1989, $3000 in 1990, $1000 in 1993, $5150 in 1994, and $4600 in 1995. She also requested attorney's fees for the contempt petition.

In Father's answer to the contempt petition, he denied all of Mother's allegations except that the parties had entered into an Agreement providing for alimony based on a percent of the distributions from the Business. In Father's supplemental answer, he contended that he paid $57,877.15 to Mother in alimony under the Agreement and $6000 in interest on a loan used to satisfy the parties' 1987 income tax debt. He did not address Mother's allegation concerning the child support arrearage other than to make a general denial. The cause was heard by the trial judge in a bench trial.

Both parties presented expert witnesses at trial regarding the calculation of alimony. Mother proffered the testimony of the accountant who helped create the formula used in the Agreement, Houston Payne. As noted above, the Agreement provided that, for the year 1988, Father would owe alimony only for months in which distributions to him totaled more than $2,000. In subsequent years, the Agreement set out a formula for calculating alimony based on "all distributions" to Father during the given year.

Prior to trial, Father produced his Schedule K-1 forms, showing his total compensation from the Business in a given year. No evidence was introduced at trial regarding the amount of distributions Father received in a given month in 1988. For 1988, Payne found that Father received total distributions of $23,568. Despite having no monthly figures for 1988, Payne calculated alimony for that year at $12,319. To calculate alimony due for 1989 to 1996, Payne included the

3

director's fees as part of the "distributions" to Father, and also used Father's 28% ownership interest for the years 1992 to 1996. Payne stated his belief that the director's fees should be included as part of the distributions on which the alimony calculations were based because the language in the Agreement included "all distributions." Payne considered the director's fees to be "an unusually large amount." Payne also testified that the increase in ownership had no effect on the parties' agreement, and included the increase in ownership in his alimony calculation. Payne calculated the total amount of alimony for 1988-1996 to be $130,260, not including Mother's share from the sale of the Business.

Payne calculated the amount due to Mother from the sale of the Business at $58,986. He applied the formula in the Agreement to the entire $100,000 of proceeds from the sale, without subtracting the $46,200 basis, purportedly because the Agreement instructed that the formula be applied to "any distribution received by the Husband." This calculation was based on Father's 28% increased ownership interest, rather than his original 16 2/3% interest.

Father presented the expert testimony of Joel Giles ("Giles"), a certified public accountant. Giles did Father's tax returns for 1993 to the date of trial. He also did the tax returns for the Business. Giles did not calculate alimony for the year 1988 because, without seeing the amounts Father received in each month, there was no way to determine whether Father had distributions exceeding $2000 in any one month. His alimony calculations for the years 1989 to 1996 did not include the director's fees because the tax returns of the Business classified the payments as payments for services. Giles explained that a distribution is a payment to a shareholder reflecting a share of the corporation's profits, income or appreciation, while a director's fee is an operating expense of the corporation. Father's increased ownership was not included in Giles' calculations; Giles' calculations were based on the original 16 2/3% ownership interest. On this basis, Giles calculated the total alimony due as $51,762, not including any amount due Mother from the sale of the Business.

Giles calculated the amount due to Mother from the sale of the Business as $16,985. In his calculation, he deducted Father's $46,200 basis in the Business prior to applying the formula. He also used the 16 2/3% ownership interest that Father owned at the time of the divorce. He testified that Father was given the basis in the original Agreement and, thus, it should not be redistributed when the Business was sold.

4

Father testified that he purchased the additional stock in the Business from a partner that was very active in the Business. As a result of the active partner leaving, the board of directors determined that the stockholders would need to become more active. Father testified that, as a result, he maintained more than forty accounts at the pharmacy. He stated that the director's and consultation fees were paid to him for services he actually performed. Although Father did not testify whether, through his status as a stockholder, he controlled the classification of these monies as director's fees, the Agreement indicated that Father was "actively involved in the business activities" of the Business and that he "may have some control over the business activities" of the Business.

On cross examination, Giles testified about his knowledge of the Business gained through his position as CPA for the Business. Giles testified that no director's or consultation fees were paid to any stockholders before July, 1992. Beginning in July, 1992, when the number of owners decreased from three to two and Father's interest increased, director's fees were paid to both owners. Because the other owner refused to provide his tax forms, Giles could not say how much the other owner received. Giles did testify, however, that the fees were paid to each owner based upon their percentage of interest in the corporation.

Evidence at trial showed that the parties retained several jointly held credit cards after their 1988 divorce, including a Goldsmith's card, a Citibank Visa card, and an American Express card. Father testified that he was due a credit or set-off for amounts he paid on these credit cards for charges made by Mother after their divorce. He testified that Mother told him the bills were covered by the Agreement and that it was his obligation to pay them. He conceded that he used the credit cards also, and that Mother did not use the Citibank Visa card after 1989. He testified that payments on the Visa card for the years 1990 to 1994 were for the accumulated balance Mother had on the card. Father produced copies of various credit card statements and canceled checks allegedly reflecting payments made for Mother's charges. He also presented several signed receipts showing charges Mother made on the American Express card. After subtracting out payments made by himself and his current wife, Father claimed that he made payments totaling $19,422 for Mother's post-divorce charges.

Mother agreed that the parties kept several joint credit cards after the divorce and admitted that she made some charges on the American Express card and the Citibank Visa card. She claimed,

however, that Father took the responsibility for the cards, and therefore the bills went to him. She

testified that she used the Visa card only through the end of 1988. She denied using the card after

that, claiming that she never received a new card when her card expired. She stated that someone

else signed her name to charge slips for the Visa card after 1988.

At trial, Mother asserted that Father failed to increase the monthly child support from $1500

to $2000 per month as required by the Agreement starting in July, 1988. Mother claimed that she

received a total of $73,250 in child support since the parties' divorce. Under the Agreement, she

claimed that she should have received $86,500 in child support. The failure of Father to increase

his payments as required in the Agreement created a child support arrearage of $13,250.

Father admitted that he never increased his child support payments to $2000 per month as

the Agreement provided. He argued, however, that he paid total child support of $90,870 since the

parties' divorce. He provided a list showing all of his alleged payments. He provided canceled

checks showing payments totaling $81,870. Two of the checks totaling $900 were for temporary

child support paid before the parties' divorce. Payments totaling $2250 were paid directly to the

parties' children. Father also included a $5000 check drawn on his credit card made out to BG

Brownyard.

Father also claimed that he paid $61,168.93 in extraordinary expenses for the children under

the Agreement, which Mother disputed. He included expenditures of $5000 for a Chevy Blazer

bought for the parties' son, $18,188 for a 1989 Ford Probe purchased on the same day, and $12,500

for a 1990 Ford Probe purchased for the parties' daughter. Father conceded that he drove the 1989

Ford Probe for at least a year, and that all of these vehicles were returned to him after the children

used them. Many of the expenditures were for the children's credit card charges while attending

college. Father also included payments for repairs to the above vehicles, for registration tags, and

for car insurance. One car repair for $551.22 was inadvertently listed twice.

After hearing the testimony, the trial court made extensive findings of fact. The trial court

found:

> The Respondent in this cause has shown his unwillingness to accept responsibility
> for obligations to the Petitioner by refusing to comply with the Orders of this Court
> by his wilful non-payment of alimony obligations over the past several years since
> the parties' divorce, and his wilful non-payment of child support for the care and
> support of the parties' minor children.

The trial court therefore found Father to be in willful contempt for failure to pay child support and alimony.

On the issue of alimony, the trial court found that it was the intent of the Agreement that Mother share in the increased ownership interest in the Business. Moreover, the trial court found that Mother was to share in any income or distribution Father received from the Business, including the director's fees. The director's fees were considered excessive by the trial court and merely an attempt to reduce the amount of alimony to which Mother was entitled. The trial court chose to rely on Payne's calculations in its award of alimony and child support. Accordingly, the trial court awarded delinquent alimony of $131,170, or $186,464 with interest through December 31, 1997. No credit was given against Father's alimony arrearage for his payment of the IRS debt or for payment of Mother's post-divorce credit card bills. The trial court also awarded Mother $58,986 for her share of the sale of the Business.

In regard to the delinquent child support, the trial court denied Father's request to receive credit for various expenditures, such as providing the children with used automobiles, stating that it "flies in the face of reality and is not in accordance with the case law." As a result, the trial court awarded delinquent child support of $13,250, or $22,500 with interest through December 31, 1997. Although the trial court found that Father had paid some of the children's college expenses, it found that there was no proof that he had paid more than one-half of the educational expenses. Father was therefore ordered to pay one-half of the $17,000 student loan. The trial court also ordered Father to pay $2050 of Mother's attorney fees and $1540 for Payne's expert witness fees. From this order, Father now appeals.

On appeal, Father asserts that the trial court judge incorrectly calculated the delinquent alimony amount because the increased ownership in the Business from 16 2/3% to 28% should not have been included in the calculation. Father also disputes the trial court's treatment of the director's fees and consultation fees as a "distribution" for purposes of the alimony calculation. Second, Father asserts that the trial court incorrectly calculated Mother's share of the sale proceeds from the Business because it erroneously included his original basis and increased ownership. Husband also contends that the trial court did not properly calculate his previous child support payments in awarding the $13,250 child support arrearage award. Father argues further that he should not have to pay one-half of the $17,000 student loan taken out by Mother for their son's college expenses

7

because Father has already paid more than one-half of the college expenses. Finally, Father disputes the award of $2050 in attorney's fees and $1540 in expert witness fees.

Our review of this case is governed by rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the findings of fact, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). Review of findings of law are *de novo* without a presumption of correctness. ***See Cowden v. Sovran Bank Cent. S.***, 816 S.W.2d 741, 744 (Tenn. 1991).

Father's first issue on appeal is whether the trial court erred in calculating the delinquent alimony payments. Father claims the calculation was erroneous because the director's fees were included as "distributions," the 28% increased ownership interest was used rather than Father's original 16 2/3% interest, and the amount owed from the sale of the Business was computed incorrectly.

Father asserts that the trial court incorrectly deemed the director's and consultation fees of $107,769.42 as "distributions" for purposes of calculating alimony. Father insists that this money was for services rendered and did not qualify as "profits, income or appreciation." Mother responds that the director's fees were actually corporate distributions that were reclassified as fees for tax purposes and to reduce Father's alimony obligations, and thus should be included in the alimony calculations. The trial court included the fees in its calculations because it found that the director's fees of up to $25,000 per year were excessive and were "an attempt to cut Mrs. Brownyard out of her percentage of the income from the corporation."

When the resolution of the issues in a case depends upon the credibility of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. ***See Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. App. 1997); *see also **McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***See In re Estate of Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997); ***McCaleb***, 910 S.W.2d at 415. The trial court will not be reversed unless there is found in the record clear, concrete,

8

and convincing evidence other than the oral testimony of witnesses that contradicts the trial court's findings. *See Hawkins v. Ellis*, No. 02A01-9708-CH-00203, 1998 WL 704521, at * 4 (Tenn. App. Oct. 12, 1998) (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. App. 1990)).

As stated above, Father testified that the director's and consultation fees were for services he performed for the Business. There was no evidence about his ability to classify the money as director's fees, other than the language in the Agreement that he had some control over and was actively involved in the Business. Payne admitted that if the monies paid to Father were earned income, then they would not reflect a share of the profits, income, or appreciation of the Business. Payne concluded, however, that the monies should be included in the calculation based on his opinion that the fees were excessive and the language of the Agreement that Mother share in all distributions. He testified that he had never seen director's fees as high as those paid in this case in his employment as an accountant. Giles simply relied on Father's assurances to him that the director's fees were for services rendered. He did note, however, that the Business had classified the fees as payment for services on its tax returns.

Father asserted that the director's fees were for services he rendered. Payne and Giles, both qualified certified public accountants, offered conflicting professional opinions as to whether the director's and consultation fees should be included in the calculation of the delinquent alimony. Their opinion also depended on whether Father actually performed services for the fees. The trial court weighed the credibility of the witnesses and concluded that "the facts bear out that the calculations by Mr. Houston Payne, CPA, should be relied upon by this Court in determining the amount to be paid to Mrs. Brownyard." The trial court determined that director's fees of up to $25,000 per year were excessive. These factual findings are necessarily based on the trial court's assessment of the credibility of Father's testimony that he performed services for the director's fees, as well as the trial court's assessment of the expert testimony of Payne and Giles. With appropriate deference to the trial court's determination of credibility, we cannot say that the evidence preponderates against its factual findings. Accordingly, the trial court's decision to include the director's fees in the alimony calculation is affirmed.

Father also asserts on appeal that the trial court erroneously found that he owed alimony for the year 1988, adopting the calculations of Mother's expert, Houston Payne. For 1988, Payne calculated alimony of $12,319 although there was no evidence that Father received more than $2000

9

in distributions in any one month. The only evidence presented at trial was that Father received total distributions of $23,568 for 1988; he did not testify as to his monthly income for 1988. Payne indicated that Father denied having received over $2000 in any single month in 1988. Father asserts that Mother had the burden of showing he had distributions greater than $2000 in any one month under the Agreement in order to prove an alimony arrearage for 1988. Mother asserts that the burden of establishing Father's monthly income was shifted to him by the language in the Agreement that he "shall provide each year to the Wife" a copy of his schedule K-1 tax forms which would indicate his "taxable income plus distributions made to the Husband for each year."

Normally, the party seeking a judgment for delinquent child support or alimony payments has the burden of proving the amount due. *See Pirrie v. Pirrie*, 831 S.W.2d 296, 298 (Tenn. App. 1992); *Woodard v. Woodard*, 783 S.W.2d 188, 191 (Tenn. App. 1989). Where the spouse seeking payment shows an order to pay and subsequent nonpayment, that burden is met. *See Pirrie*, 831 S.W.2d at 298. The burden then switches to the respondent to show an inability to pay. *See id.*

In her brief, Mother argues that Father has the burden of showing his monthly income was less than $2000 in any month because he was obligated to provide her with his K-1 tax forms showing his yearly taxable income. While Father was certainly delinquent in producing the K-1 forms, they were provided before trial and available to Payne. The K-1 forms, however, show only yearly income. From the yearly income for 1988, a total of $23,568, it cannot be determined whether Father had distributions over $2000 in any single month. The requirement in the Agreement that Father produce K-1 forms does not shift the burden of proof; Mother had the burden of proving the amount of alimony due and this burden was not met for the year 1988. Consequently, we find that the trial court erred in holding that Father owed alimony for the year 1988. The trial court's award for delinquent alimony for 1988 in the amount of $12,319 is therefore reversed.

Father also contends that the trial court erred in including in the calculation of alimony Father's increased ownership interest in the Business. He asserts that an increase in ownership was not contemplated in the Agreement. Mother responds that the language in the Agreement indicates that the parties contemplated including an increase in ownership by stating that "all contingencies . . . cannot be foreseen by the parties and that [Father] has an obligation of good faith in protecting [Mother's] right to receive future income based on the success or lack of success of [the Business]."

10

The trial court found that the parties contemplated and intended that any increase in ownership would be subject to the Agreement based on the above language.

A property settlement agreement is essentially a contract between a husband and wife in contemplation of divorce proceedings. *See Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993). It is " 'within the category of contracts and is to be looked upon and enforced as an agreement, and is to be construed as other contracts as respects its interpretation, its meaning and effect.' " *Bruce v. Bruce*, 801 S.W.2d 102, 105 (Tenn. App. 1990) (quoting *Matthews v. Matthews*, 24 Tenn. App. 580, 593, 148 S.W.2d 3, 11-12 (1940)). Where the contract language is ambiguous, it will be construed most strongly against the maker of the contract. *See Fuller v. Orkin Exterminating Co.*, 545 S.W.2d 103, 107 (Tenn. App. 1975). "A contract is ambiguous when its meaning is uncertain, and it can be understood in more ways than one." *Frank Rudy Heirs Assocs. v. Moore & Assocs., Inc.*, 919 S.W.2d 609, 613 (Tenn. App. 1995).

Father testified at trial that he discussed the increase in ownership with Payne, who told him that it would not affect his alimony obligations. Mother stated that she thought the Agreement gave her a portion of anything Father was paid by the Business.

The 16 2/3% ownership interest the parties owned at the time of the divorce was marital property because the parties jointly acquired it during the marriage. Rather than split up the ownership of the closely held corporation between the two parties, they chose to let Father retain ownership of the shares and continue to run the Business. In place of Wife's interest in the Business, she was given a share of the "profits, income or appreciation." Evidently, the parties agreed that this was her compensation for relinquishing her half of the parties' interest in the Business. Clearly she is entitled to receive any future income based on the success or lack of success of the Business in regard to the original 16 2/3 % interest. However, the additional 12% interest acquired by Father several years after the divorce is not clearly covered by the Agreement. The additional ownership interest did not stem from the 16 2/3% ownership, as would be the case if the stock had split; the 12% additional interest was purchased by Father with his own funds after the divorce. If Father had invested these funds in another venture, clearly Mother would not be entitled to any income arising from it. Father's acquisition of an additional interest in the Business with his own funds does not diminish the income Mother receives from the original 16 2/3% interest. In view of the parties' testimony and the ambiguous language of the Agreement, we cannot construe the decree to mean that

Mother has a right to the 12% interest acquired after the divorce with Father's separate funds; this result would be neither reasonable nor fair. Accordingly, we reverse the trial court's decision to include the income from Father's ownership interest purchased after the divorce and remand for a new calculation of alimony based on the original 16 2/3% ownership interest.

Father also maintains that the trial court made a calculation error when it added up his past alimony payments. The trial court credited Father with $24,700 in alimony payments. In calculating Father's past alimony payments, Payne used $25,610, the amount Father reported on his federal tax forms. Father presented canceled checks totaling $29,766 representing his total alimony paid. He insists that he should have been credited for this amount. At trial, he testified that some of the payments reflected in the checks were not reported to his accountants or included on his tax returns because he had just recently found them. Although Mother's attorney argued that Father should be credited only for the amount of alimony payments reflected on his tax forms, Father's evidence of alimony payments in the amount of $29,766 was not disputed at trial. Father should receive credit for these undisputed payments. The evidence preponderates against the trial court's finding that Father paid only $24,700 in alimony payments. Therefore, we remand for the trial court to credit Father's alimony arrearage with payments of $29,766.

Father insists that the trial court erred by not crediting his alimony arrearage with at least $28,111 in payments for Mother's benefit, including payments on several jointly held credit cards for Mother's post-divorce charges and one-half of a $20,100 income tax debt incurred during the marriage. Mother responds that the parties' Agreement serves as *res judicata* for the payment of the IRS bill and further that Father getting credit for paying this bill is barred by the doctrine of laches. Mother claims that credits for the payments on the jointly held credit cards are also barred by the doctrine of laches. The trial court refused to give Father credit for these payments and made no findings on the issues of *res judicata* and laches.

As noted above, after the divorce, the parties retained several jointly held credit cards, such as a Citibank card, an American Express card, and a Goldsmith's department store card. Both parties continued to use the cards after the divorce, with Father paying the bills. Father introduced credit card statements and checks showing payment on the cards. He sought an off-set against his undisputed alimony arrearage for payments of Mother's charges. For the vast majority of the charges, Father's testimony at trial was the only evidence that the charges were incurred by Mother,

12

rather than by Father or his current wife. Although Father admitted that Mother stopped using the Citibank card in 1989, he testified that payments made from 1990 to 1994 were for the balance she had accumulated on the card. He produced no receipts reflecting charges by Mother on the Citibank card. Several receipts were presented showing charges by Mother on the American Express card, and Mother did not dispute these payments. She did, however, dispute her alleged charges on the Visa card after 1988 and testified that she believed someone else signed her name for the charges.

The payments for which Father seeks a set-off against his undisputed alimony arrearage are not alimony payments. Rather, they are a separate claim. Father did not assert this separate claim in his original pleadings. Nonetheless, no objection was raised to litigating the issue based on Father's failure to assert a counterclaim for the credit card payments. While counsel for Mother argued that Father should not be allowed to set off the credit card payments, and asserted defenses to Father's claim, we find that the issue of the credit card payments was apparently tried by consent of the parties. *See* Tenn. R. Civ. P. 15.02.

Mother did not dispute that she made charges on the parties' Visa card in 1988. She did dispute later charges on the card in her name and apparently disputed Father's contention that she ran up a large balance on the card. The parties presented conflicting testimony on the charges and balance after 1988. By not awarding Father a credit for these disputed charges, the trial court implicitly found that Mother was a more credible witness on this issue than Father. A review of the record reveals no clear and convincing evidence contradicting the trial court's finding. We affirm the trial court's refusal to award Father a credit against alimony for those charges that Mother disputed.

Although Mother did not dispute the charges she made on the parties' American Express card and the charges made on the Visa card in 1988, she asserted that Father was not entitled to a set-off for these payments based on the doctrine of laches. Father produced undisputed evidence that he is entitled to a set-off for these charges that he paid unless Mother can successfully show that the doctrine of laches should apply to bar the claim.

The doctrine of laches is summarized as follows:

"The two essential elements of laches are negligence and unexcused delay of the complainant in asserting his alleged claim and injury to rights of third persons intervening during and therefore on account of the delay. Thus, the determinative test as to laches, which may be available as a successful defense in an equitable action, is not the length of time that has elapsed, but whether the party relying on

13

laches as a defense has been prejudiced by the delay. Ordinarily, laches will bar equitable remedies where delay works prejudice to a party, such as changed conditions in the premises, expenditure of money, change of value, and intervening rights. Factors to be considered with respect to the defense of laches are whether the defendant was prejudiced by the delay, whether evidence once available to the defendant is no longer available, and whether the defense has been lost by reason of the delay. However, each case in which the defense of laches is interposed must be determined upon its own facts."

*Sutton v. Davis*, 916 S.W.2d 937, 941 (Tenn. App. 1995) (quoting 11 Tenn. Jurisprudence, *Equity*, § 39). Although the application of laches is a case by case determination, a party must show that he or she was prejudiced by the delay. In this case, Mother has not shown that she has been prejudiced in any way by the delay in raising these payments. Because this is a crucial element of the doctrine, the doctrine of laches should not be applied to bar credits for the undisputed credit card payments.

Marital debts are those debts incurred during the marriage for the joint benefit of the parties. *See Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. App. 1989). Mother's post-divorce credit card charges are clearly not marital debts, therefore, Father should not be responsible for these charges. Even though he had not made the purchases, he was required to pay them to avoid negative credit card reports. Accordingly, we have determined that he should receive credits on his alimony arrearage for those payments he made on her behalf that were undisputed. The trial court's findings on the undisputed credit card charges are reversed. We remand for a determination of the amount of credit Father should receive based on the total undisputed payments.

Father's payment to the IRS is a payment of a marital debt for which Father would normally be entitled to receive a credit against alimony arrearage. Mother, however, asserts the Agreement is *res judicata* as to the IRS debt and that Father cannot relitigate the issue. Father maintains that Mother waived *res judicata* by failing to raise it in a pleading. Mother argues that she was not required to file a pleading in this case because Father never filed a counterclaim against her. Mother raised the affirmative defense at trial in her proposed findings of fact and conclusions of law. At that time, Father had the opportunity to object that the defense was not raised in a responsive pleading, but did not do so. Because Father failed to raise this objection before the trial court, he is precluded from doing so on appeal. *See Irvin v. Binkley*, 577 S.W.2d 677, 679 (Tenn. App. 1978).

The policy underlying *res judicata* is well settled:

The rule of res adjudicata is based on the principle not only that the same parties, in the same capacities, should not be required to litigate anew a matter which might have been determined and settled in a former litigation, but on the higher

14

ground, that public policy dictates that litigation should be determined with reasonable expedition, and not protracted through inattention and lack of diligence on the part of litigants or their counsel.

*Jordan v. Johns*, 168 Tenn. 525, 79 S.W.2d 798, 802 (1935). "[T]he defense of res judicata is applicable not only to issues which were in fact litigated in the former case, but also to all issues which might properly have been litigated therein." *Gulf Oil Corp. v. Forcum*, 381 S.W.2d 521, 526 (Tenn. App. 1964). A marital settlement agreement incorporated into a divorce decree can serve as a basis to assert the defense of *res judicata* where the issue was or could have been addressed in the agreement. *See Tyler v. Tyler*, 671 S.W.2d 492, 494-95 (Tenn. App. 1984) (Where a child was listed as a child born of the parties' marriage in a divorce settlement agreement, the issue was "litigated" for purposes of *res judicata* and therefore barred a later dispute about paternity of that child.).

The Agreement in this case purportedly "settl[es] all other rights and all claims of every kind and character arising out of the marital relation existing between the parties hereto." It does not specifically address marital debts other than indebtedness related to personalty, and does not mention the IRS debt. The Agreement does not include a general provision addressing which party would be responsible for debts that might be discovered after the Agreement was signed. There was evidence at trial that Father was not notified of the IRS delinquency until after the parties had entered into the Agreement, and that he would not have known to address it in the Agreement. However, the proof at trial also indicated that the parties had had tax liabilities in several of the years before the divorce, and that therefore they should have anticipated a tax liability for 1987 and could have addressed it in the Agreement. Although the trial court did not include in its order a specific ruling on this issue, it did not give Father credit against the alimony arrearage for his payment of the IRS debt, implicitly finding that the IRS debt could have been anticipated and addressed in the Agreement. The evidence in the record does not preponderate against a finding that the IRS debt could have been anticipated and included in the Agreement, and that the issue is therefore precluded under the doctrine of *res judicata*. The trial court is affirmed on this issue.

Father also argues that the $58,986 award to Mother from the sale of the Business was erroneous because Mother was not entitled to proceeds obtained from the sale of the additional ownership interest he acquired after the divorce, and that his $46,200 basis in the Business should have been deducted before the formula was applied. The trial court noted that the Agreement gave Mother a right to a share of the sale proceeds in the amount of $58,986, based on the formula in the

Agreement. This amount was calculated using the entire $100,000 sale price, including the sale proceeds from the ownership Father acquired after the divorce. The trial court did not state expressly whether the basis should be subtracted before application of the formula, but adopted Payne's calculations, which did not subtract Father's basis in the Business.

As noted above, Mother is not entitled to alimony from Father's increased ownership in the Business acquired after the divorce. For the same reasons, Mother is not entitled to the sale proceeds from the additional ownership interest. Her rights under the Agreement are limited to her share of the proceeds from the sale of the 16 2/3% owned at the time the parties entered into the Agreement.

Under the Agreement, Father received the $46,200 basis in the Business and Mother received a right to a share of the sale proceeds if the Business were sold. Father argues that the trial court should have first deducted the basis before application of the formula, because to apply the formula to the basis would give Mother a share of the property awarded to him in the divorce. Father argues that the Agreement states that the formula applies only to "profits, income or appreciation," indicating that Mother was not intended to receive a portion of Father's basis upon sale. Mother emphasizes that although Payne did not subtract the basis before applying the formula, he took the basis into consideration. She asserts that Payne considered the basis in calculating the taxes due on the sale. Under the formula, Mother's share of the sale proceeds is determined after the deduction of federal taxes and the basis affects the amount of the federal taxes. The trial court implicitly found that the basis should not be subtracted before application of the formula, evidenced by its adoption of Payne's calculations.

Payne conceded that $46,200 of the $100,000 sale proceeds was Father's basis in the Business, given to him in the Agreement. If the entire $100,000 was subject to the formula, Mother would receive about one-half of Father's basis. Moreover, Payne testified that "you wouldn't necessarily define basis" as profits, income or appreciation "although profits and income do enter into the calculation of basis." Giles subtracted the basis before applying the formula because he understood that the Agreement gave Father the basis outright.

As stated above, the Agreement did not discuss whether the basis was to be subtracted before application of the formula. However, the Agreement awarded the basis to Father. In addition, the language in the Agreement indicated the parties' intent that Mother share in the "profits, income or appreciation," which Mother's expert witness conceded would not accurately describe basis. In view

16

of the language of the Agreement and the parties' intent, we cannot construe the Agreement to apply the formula to the entire sale proceeds, including the basis. We must conclude the Agreement excludes the basis originally awarded to Father from application of the formula. Accordingly we reverse the trial court's award to Mother of $58,986 for her share of the sale proceeds and remand for a calculation based on the 16 2/3% ownership interest and the application of the formula to the sale proceeds after the subtraction of Father's basis.

Father contends that the trial court did not properly calculate his previous child support payments in awarding the $13,250 child support arrearage award. Neither party disputed that Father's total child support obligation under the Agreement was $86,500. Father maintains that he made payments totaling $81,870, and thus his arrearage is $4630. Mother responds that many of Father's payments were made directly to the children, and are thus deemed to be gifts under Tennessee law. The trial court credited Father with payments of $73,250, leaving an arrearage of $13,250.

Child support is usually paid to the clerk of the court or to the custodial parent. *See* Tenn. Code Ann. § 36-5-101(a)(4) (Supp. 1998); *State ex rel. Cope v. Cope*, No. 03A01-9404-CV-00119, 1994 WL 579976, at *2 (Tenn. App. Oct. 24, 1994) (Susano, J., dissenting opinion). Tennessee Code Annotated provides that "[t]he order or decree of the court may provide that the payments for the support of such child or children shall be paid either to the clerk of the court or directly to the spouse." Tenn. Code Ann. § 36-5-101(a)(4) (Supp. 1998). Tennessee courts allow a credit for payments made directly to a child " 'for the children's necessaries which are not being supplied by the custodial parent.' " *State ex rel. Cope*, 1994 WL 579976, at *2; *Oliver v. Oczkowicz*, No. 89-396-II, 1990 WL 64534, at **2 (Tenn. App. May 18, 1990).

Copies of checks and bank records provided at trial show payments by Father of $81,870. These documents include two checks totaling $900 for temporary child support prior to the divorce decree, three checks totaling $2250 made out directly to the parties' son, Ryan Brownyard, and a credit charge statement reflecting a $5000 check drawn on the credit card made out to BG Brownyard. There is no evidence in the record that the checks written to Ryan Brownyard and RG Brownyard were for necessities for Ryan that were not provided by Mother, the custodial parent.

Moreover, $900 in temporary child support was paid prior to the parties' divorce, before Father was obligated to pay child support under the Agreement. Therefore, the trial court did not err in declining to credit Father for these payments.

However, without considering these payments, Father produced checks at trial showing payments totaling $73,720 in child support from 1988 to 1993. These payments were not disputed by Mother at trial. As stated above, the trial court credited Father with payments of $73,250, but did not explain why it denied him credits for payments documented by checks in the record. This evidence preponderates against the trial court's calculations. For these reasons, we find that Father paid $73,720 in child support from 1988 to 1993, leaving an arrearage of $12,780. The trial court's judgment is therefore modified to the amount of $12,780.

In addition to the payments Father claimed above as child support, Father contends that he paid $61,168.93 in extraordinary expenses for the children under provision seven in the Agreement that the parties will split any unusual or extraordinary expenses. Mother asserts that these payments were unsubstantiated and contends that Father's testimony on this issue was not credible. The trial court concluded that none of the expenditures Father claimed under this provision, such as furnishing the children with used automobiles, were extraordinary special expenses within the meaning of the Agreement. The trial court also found that Mother provided the funds for the children's daily needs, such as activities, insurance, gasoline, and automobile repairs, without asking Father to pay one-half of these necessary expenses.

Many of the expenses claimed by Father revolve around the children's use of automobiles furnished by Father. For example, Father claimed a credit of $5000 for a Chevy Blazer bought for the parties' son, $18,188 for a 1989 Ford Probe purchased two days later, and $12,500 for a 1990 Ford Probe purchased for the parties' daughter. The record indicates that Father drove the 1989 Probe for at least a year. The children drove the cars, but they were eventually returned to Father.

As noted above, when the resolution of an issue in a case depends upon the credibility of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a better position than this Court to determine the witnesses' credibility. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997); *see also McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). The trial court did not credit Father's testimony as to the extraordinary expenses. Indeed, the trial court stated that Father's "request that

18

he receive credit for these necessary expenses for the children flies in the face of reality and is not in accordance with the case law set forth in [his] brief." Father points to no clear, concrete, and convincing evidence in the record that contradicts the trial court's findings. For these reasons, we defer to the trial court's determination of credibility on this issue and affirm the trial court's refusal to grant Father credit for these expenditures.

Father asserts that he should not be obligated to pay one-half of the $17,000 student loan Mother took out for their son's college education because he has already paid more than one-half of the children's college expenses. The record reflected documented payments of $4688.19 made by Mother. Father claims his documentation shows that he paid $38,817.65 towards the children's college expenses. The trial court found that although both children are still in college, Father is not currently contributing to their expenses. Moreover, the trial court found "no creditable proof that [Father] paid more than one-half of the children's college expenses." These factual findings are entitled to a presumption of correctness. *See* Tenn. R. App. P. 13(d).

Father has provided extensive documentation of payments he has made for the children's college expenses in the form of canceled checks and credit card bills. Despite the large sum of these payments, Father failed to provide evidence of the total college expenses for the two children. Without proof of this amount, we cannot say that the evidence preponderates against the trial court's finding that he has not paid one-half of the expenses. Accordingly, we affirm the trial court's finding that Father is obligated to pay for one-half of the student loan at issue.

Finally, Father contests the trial court's award to Mother of $2050 in attorney's fees and $1540 in expert witness fees. A parent who turns to the courts to enforce a child support obligation may recover reasonable attorney's fees from the delinquent spouse. These fees are within the court's discretion. *See* Tenn. Code Ann. § 36-5-103(c) (Supp. 1998); ***Sherrod v. Wix***, 849 S.W.2d 780, 784-85 (Tenn. App. 1992). Unless there is an abuse of that discretion, the award will not be altered. ***See Threadgill v. Threadgill***, 740 S.W.2d 419, 426 (Tenn. App. 1987). In this case, the record shows that Father was extremely delinquent in his payments and Mother was forced to go to court to collect the delinquent child support and alimony payments. "Unquestionably, the delinquency in child support payments has necessitated the employment of counsel for enforcement." ***Haynes v. Haynes***, 904 S.W.2d 118, 122 (Tenn. App. 1995). We affirm the trial court's award of these fees.

19

In sum, the trial court's finding of contempt is affirmed. The alimony arrearage is affirmed in part, reversed in part, and modified. We affirm the trial court's finding that the director's fees be included in the alimony calculation. The $12,319 alimony award for 1988 is reversed because Mother failed to meet her burden in showing distributions to Father exceeding $2000 per month. The trial court's finding that Father's increased ownership in the Business should be included in the alimony calculation for the years 1989 to 1996 is reversed and the cause remanded for an alimony calculation based on the original 16 2/3% ownership interest with credits for undisputed credit card payments made on Mother's behalf. The credit of $24,700 for previous alimony payments is modified to $29,766 based on undisputed payments in the record. Father's request for a credit for the IRS debt is barred because of *res judicata.* The trial court's award to Mother of $58,986 for her share of the sale proceeds from the Business is reversed and remanded for a calculation based on the original 16 2/3% ownership interest. Father's basis should be subtracted from the sale proceeds before application of the formula.

The child support arrearage is modified from $13,250 to $12,780 based on undisputed payments in the record. We affirm the trial court's refusal to grant Father a credit against this arrearage for extraordinary expenses. The trial court's order that Father pay one-half of the $17,000 student loan is affirmed along with the trial court's order that he pay attorney's fees and expert witness fees.

The decision of the trial court is affirmed in part, reversed in part and modified, and the cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs are taxed equally to Appellant and Appellee, for which execution may issue if necessary.


_____

_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**ALAN E. HIGHERS, J.**

20